IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **STRATOSAUDIO, INC.,** | § | |
| *Plaintiff,* | § | |
| | § | **6:20-CV-01125-ADA** |
| **v.** | § | |
| | § | |
| **HYUNDAI MOTOR AMERICA** | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Hyundai Motor America's ("HMA" or "Hyundai") Rule

12(b)(3) Motion to Dismiss for improper venue pursuant to 28 U.S.C. §§ 1400(b), 1406. Dkt. 12.

After careful consideration of the relevant facts, applicable law, and the parties' oral arguments,

the Court **DENIES** HMA's Motion.

## I.    BACKGROUND

Plaintiff StratosAudio, Inc. ("StratosAudio") filed this action against HMA on December

11, 2020, asserting infringement of seven patents by HMA's vehicles with certain infotainment

systems. Dkt. 1. On February 22, 2021, HMA moved to dismiss the action for improper venue

under Rule 12(b)(3). Dkt. 12. HMA is a California corporation with its principal place of business

in Fountain Valley, California. Dkt. 1 at 2, ¶ 7. HMA may be served through its registered agent

for service in the State of Texas and has been registered to do business in the State of Texas since

at least May 13, 1986. *Id.*

For propriety of venue, Plaintiff alleges the following: HMA distributes new automobiles

in this judicial district exclusively through its five authorized HMA dealerships in this District. *Id.*

at 3, ¶ 10; Dkt. 21 at 3. All authorized HMA dealerships in this District are named with the

"Hyundai" designation and prominently display Hyundai trademarks and use the Hyundai trade

name. Dkt. 1 at 3, ¶ 11. HMA dealerships in this District are displayed on HMA's website as places of Hyundai, where users can locate the Hyundai dealerships, check available inventory, and schedule a test drive. *Id.* at ¶ 12. HMA provides new purchase warranties and warranty service and repairs through its authorized dealerships. *Id.* at 4, ¶ 13. HMA also directly controls various aspects of its dealerships' operations, including the sale of automobiles, training service technicians through its Car Care Express program, and offering financing through Hyundai Motor Finance. *Id.* at ¶ 14. HMA further controls the sale or ownership transfer of its authorized dealers, including the right to refuse transfer and the operating location of the dealers. *Id.*

## II.   LEGAL STANDRD

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss an action for "improper venue." FED. R. CIV. P. 12(b)(3). 12 U.S.C. § 1440(b) is the "sole and exclusive provision controlling venue in patent infringement actions." *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514, 1519 (2017). "Whether venue is proper under § 1400(b) is an issue unique to patent law and is governed by Federal Circuit law," rather than regional circuit law. *In re ZTE (USA) Inc*., 890 F.3d 1008, 1012 (Fed. Cir. 2018). "[U]pon motion by the Defendant challenging venue in a patent case, the Plaintiff bears the burden of establishing proper venue." *Id*. at 1013–14. Plaintiff may carry this burden by establishing facts that, if taken to be true, establish proper venue. *Castaneda v. Bradzoil, Inc*., No. 1:20-CV-1039-RP, 2021 WL 1390423, at *1 (W.D. Tex. Apr. 13, 2021). "On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Id*. (citing *Braspetro Oil Servs. Co. v. Modec (USA), Inc*., 240 F.App'x 612, 615 (5th Cir. 2007) (per curiam)). In determining whether venue is proper, "the Court may look beyond the complaint to

evidence submitted by the parties." *Ambraco, Inc. v. Bossclib, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009).

Section 1400(b) provides that venue in patent cases is proper "[1] where the defendant resides, or [2] where the defendant [a] has committed acts of infringement and [b] has a regular and established place of business." 28 U.S.C. § 1400(b). Under the first prong, the Supreme Court has held that "a domestic corporation 'resides' only in its State of incorporation for purposes of the patent venue statute." *TC Heartland*, 137 S. Ct. at 1517. Under the second prong, the Federal Circuit interpreted, in *In re Cray Inc.*, 871 F.3d 1355 (Fed. Cir. 2017), "regular and established place of business" to impose three general requirements: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *Id.* at 1360. Regarding the first requirement, a "place" refers to a "'building or a part of a building set apart for any purpose' or 'quarters of any kind' from which business is conducted." *Id.* at 1362 (citations omitted). Regarding the second requirement, "regular" means that the business must operate in a "'steady, uniform, orderly, and methodical' manner," and "sporadic activity cannot create venue." *Id.* (citations omitted). And the third requirement means that the place cannot be solely a place of the defendant's employee – "the defendant must establish or ratify the place of business." *Id.* at 1363.

Subsequently, in *In re Google LLC*, 949 F.3d 1338 (Fed. Cir. 2020), the Federal Circuit added a fourth requirement: "a 'regular and established place of business' requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'"[1] *Id.* at 1345.

---

[1] In *Google*, Federal Circuit considered this requirement as part of the second *Cray* factor. *In re Google LLC*, 949 F.3d 1338, 1344 (Fed. Cir. 2020) ("We agree . . . that under the second *Cray* factor, a 'place of business' generally requires an employee or agent of the defendant to be conducting business at that place."). However, this *Google* requirement is essentially a different requirement than the original second

## III.    DISCUSSIION

The main dispute before the Court is whether Defendant HMA has "a regular and established place of business" in this District. The parties do not dispute that defendant HMA does not "reside" in this District and therefore the first prong of Section 1400(b) does not apply. Under the second prong, the parties do not dispute that Plaintiff has plausibly pled that "defendant has committed acts of infringement" and the parties also do not dispute that the dealerships are "physical places" in this District and are "regular and established" under the first and second *Cray* requirements. Therefore, the Court discusses below whether the third and fourth requirements are met in this case to establish proper venue in this District.

### A.    Ratification

Under the third *Cray* requirement, a plaintiff must show that the place of business at issue is "the place of the defendant." *In re Cray*, 871 F.3d at 1360. To meet this requirement, "the defendant must establish or ratify the place of business." *Id.* at 1363. There is no bright-line rule for this inquiry. *Id.* at 1362 ("In deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts."). The Federal Circuit set forth a number of considerations to determine whether the defendant has ratified the place of business, including: (1) "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place"; (2) "whether the defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed or sold from that place"; (3) whether the defendant has made "representations that it has a place of business in the district"; and (4) "the nature and activity of the alleged place of business of the defendant in the district in

*Cray* requirement, which places more focus on the phrase "regular and established." Therefore, this Court treats the *Google* requirement as a fourth requirement in addition to the three *Cray* requirements.

comparison with that of other places of business of the defendant in other venues." *Id*. at 1363-64. These considerations are not exhaustive but are more illustrative in nature. *Blitzsafe Texas, LLC v. Bayerische Motoren Werke AG*, No. 2:17-CV-00418-JRG, 2018 WL 4849345, at *6 (E.D. Tex. Sept. 6, 2018).

More recently, the Federal Circuit found additional factors relevant to this analysis, including: "the nature of [the defendant's] relationship with [its] representatives [in the District], or whether it has any other form of control over any of them"; "whether [the defendant] possesses, owns, leases, or rents the [facility] . . . or owns any of the equipment located there"; "whether any signage on, about, or relating to the [facility] associates the space as belonging to [the defendant]"; and "whether the location of the [facility] was specified by the defendant or whether [a third party] would need permission from the defendant to move [the facility] outside of the . . . District or to stop working for [the defendant]." *In re ZTE (USA) Inc*., 890 F.3d 1008, 1015–16 (Fed. Cir. 2018).

### 1. *Defendant exercises control over the dealerships' places in this District.*

HMA argues that it does not exercise any control over its dealerships in this District because the Texas Occupation Code "specifically prohibits auto manufactures and distributors from owning, operating, controlling, or acting in the capacity of an auto dealership." Dkt. 12 at 4–5; Tex. Occ. Code § 2301.476(c) ("[A] manufacturer or distributor may not directly or indirectly . . . operate or control . . . a franchised dealer or dealership."). However, this does not mean that HMA does not exercise *de facto* control of the dealerships to some degree, nor does it mean that the dealerships are not places of HMA as a matter of law. *See, e.g.*, *Blitzsafe*, 2018 WL 4849345, at *7.

As Plaintiff points out, HMA controls numerous aspects of the dealerships' operations through the Hyundai Dealer Sales & Service Agreement. Dkt. 21 at 6-12. HMA's alleged control

over its dealers include: (1) the dealers' premises and facilities ("DEALER agrees that all of its facilities will be satisfactory as to space, appearance, amenities, layout, equipment, and signage and will at all times be in accordance with HMA's minimum facilities standards, as amended from time to time."); (2) the dealers' inventory ("DEALER agrees . . . that it will, at all times, maintain at least the minimum inventory of Hyundai Motor Vehicles requested by HMA"; "Dealer shall not move or permit to be moved any Inventory from the Premises without the prior written consent of Lender."); (3) the price and manner of payment ("DEALER agrees to pay for Hyundai Products pursuant to such procedures as HMA may designate from time to time. . . . DEALER will make arrangements with its designated financial institution to accommodate the use of such systems."); (4) the dealers' minimum net working capital amount ("DEALER agrees to establish and maintain actual net working capital in an amount not less than the minimum net working capital . . . . If HMA determines, in its sole discretion, that changed circumstances require it to adjust the net working capital requirement hereunder, DEALER agrees to revise its minimum net working capital to be used in the dealership's operation accordingly."); (5) the price and the terms upon which dealers purchase HMP vehicles and maintenance service ("HMA reserves the right, without prior notice to DEALER, to establish and revise prices and other terms of sale for all Hyundai Products sold to DEALER under this Agreement."); (6) the terms and scope of warranties to be included in its vehicle sales ("DEALER is free to sell warranty or service contract protection for Hyundai Motor Vehicles which is different from and independent of HMA's warranties . . . however, DEALER agrees that if it elects to sells such independent warranties . . . DEALER will conspicuously disclose in writing upon the Customer's purchase order the extent to which the independent warranty or service contract protection purchased by the Customer overlaps that provided by HMA."); (7) monthly or even daily reporting of finances and operations by each dealer

("Dealer shall provide to [HMA] (A) Dealer's monthly factory/distributor financial statements . . . (B) . . . Dealer's adjusted calendar year-end factory/distributor financial statements …(C ) … Dealer's balance sheet as at the end of each fiscal year …, in each case reviewed by an independent certified public accountant acceptable to [HMA]…, and (D) Dealer's corporate tax returns for each calendar year"; "DEALER agrees to … [a]ccurately report to HMA, with such relevant information as HMA may reasonably require, the delivery of each new motor vehicle to a purchaser by the end of the day in which is the vehicle is delivered to the purchaser thereof."); (8) the IT equipment such as computers and data processing systems that its dealers must use and maintain ("Dealer shall provide [HMA] or its designee full access to Dealer's computer systems and take such other action as may be requested by [HMA.]"); (9) the number of personnel that its dealers must have on-site and their certifications and training ("DEALER agrees to establish and maintain a complete service and parts organization, including a service manager, a parts manager and a sufficient number of Customer relations, service and parts personnel who meet such educational, management, technical training and competency standards as HMA may establish or approve."); (10) performance reviews on the dealers' sales, service, and parts, customer satisfaction, and  even the dealer's maintenance of its premises and facilities; and (11) restricting whether and to whom a dealer may sell or transfer its business ("[A]ny change in ownership, regardless of the share or relationship between parties, or any change in General Manager, from the person(s) identified herein, requires the prior written consent of HMA;" "Dealer shall not change its type of organization, jurisdiction of organization or other legal structure except with the prior written consent of [HMA.]"). Dkt. 21 at 6–21.

This Court is not persuaded by HMA's argument that Texas law deters HMA's exercise of control over its dealerships. As explained above, HMA boasts a broad scope of control over its

dealerships. Requiring dealerships to send daily reports to HMA is just one of many examples of its extensive control. Nevertheless, HMA argues that "[i]f any contractual term constituted 'control,' then the provision would be illegal and would therefore be unenforceable." Dkt. 24 at 7. But HMA cannot have its cake and eat it, too. HMA cannot enter into the Sales & Service Agreement with dealers in this District and try to enforce the Agreement on the one hand, and on the other hand argue that provisions of the Agreement are unenforceable for venue purposes.

### 2. *Defendant's relationship with the dealerships is conditioned on the dealerships' continued presence in this District.*

As HMA points out, under Texas law, HMA is not permitted to directly sell vehicles to consumers in this District. Dkt. 12 at 4; Tex. Occ. Code § 2301.476(c) ("[A] manufacturer or distributor may not directly or indirectly . . . act in the capacity of a franchised or nonfranchised dealer."). Therefore, the only way that HMA can sell its vehicles to consumers in this District is through authorized dealerships that it currently has in the District. As Plaintiff alleges, new Hyundai vehicles are available for purchase exclusively through these authorized dealers. Dkt. 21 at 3. Thus, it is not surprising that HMA imposed stringent restrictions on the locations and ownership transfer of its authorized dealership in this District: "DEALER agrees not to display Hyundai marks or to conduct any dealership operations . . . at any location other than the location(s) approved herein, without the prior written consent of HMA"; and "[A]ny change in ownership, regardless of the share or relationship between parties, or any change in General Manager, from the person(s) identified herein, requires the prior written consent of HMA." *See id*. at 5 and 12.

### 3. *Defendant represents to the public that it has a place of business in this District.*

Under this factor, "[p]otentially relevant inquiries include whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on

a sign associated with or on the building itself." *In re Cray*, 871 F.3d at 1363–64. "But the mere fact that a defendant has advertised that it has a place of business or has even set up an office is not sufficient; the defendant must actually engage in business from that location." *Id*. at 1364. "Marketing or advertisements also may be relevant, but only to the extent they indicate that the defendant itself holds out a place for its business." *Id*. at 1363.

HMA represents to the public that it has a place of business in the Western District of Texas. When a user searches for Hyundai dealerships in the District, HMA's website displays a list of its authorized dealerships, allows the user to search for these dealerships' inventory, and gives the user an opportunity to schedule a test drive. Dkt. 21 at 4. HMA also allows all its dealerships in this District to display the "Hyundai" logo and use its Hyundai trademarks and tradenames. *Id*. at 3.

In fact, HMA actually engages in business from the locations of its dealerships in this District. First, HMA conducts business in this District by distributing Hyundai vehicles to its authorized dealers. Second, and more importantly, HMA provides new purchase warranties to consumers at the dealerships in this District. Dkt. 1, ¶ 13; Dkt. 21 at 9. HMA contends that the warranty services are performed by independent dealerships selected by vehicle owners. Dkt. 12 at 11. However, HMA does not deny that it pays for the warranty services. Under Texas law, that means HMA engages business in the state. Tex. Occ. Code § 2301.251(c) ("A manufacturer or distributor that directly or indirectly reimburses another person to perform warranty repair services on a vehicle is engaged in business in this state regardless of whether the manufacturer sells or offers for sale new motor vehicles in this state.").

In view of the above, the Court finds that HMA ratifies the places of business of its authorized dealerships in this District and those dealerships are therefore "place[s] of the defendant" under the third *Cray* requirements.

### B.  Agents Conducting Defendant's Business in this District

In *In re Google*, the Federal Circuit also ruled that "a 'regular and established place of business' requires the regular, physical presence of an employee or other agent of the defendant conducting the defendant's business at the alleged 'place of business.'" *In re Google*, 949 F.3d at 1345.

### 1.  *The authorized dealers are HMA's agents.*

"An agency relationship is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act.'" *Id*. at 1345 (citing Restatement (Third) of Agency § 1.01). "The essential elements of agency are (1) the principal's right to direct or control the agent's actions, (2) the manifestation of consent by the principal to the agent that the agent shall act on his behalf, and (3) the consent by the agent to act." *Id*. (citing *Meyer v. Holley*, 537 U.S. 280, 286 (2003)) (internal quotation marks omitted).

HMA argues that the dealerships are not HMA's agents because the agreement explicitly specifies that "[t]his Agreement does not make DEALER the agent or legal representative of HMA . . . for any purpose whatsoever." Dkt. 42 at 1. Again, it is the substance of the agreement that controls, rather than the label the parties assign to their purported relationship. *See, e.g., In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d 936, 956 (N.D. Cal. 2014) (agency is a fact-dependent relationship). "While cases generally find that dealership agreements do not create

general principal-agent relationships, it is not—as a matter of law—impossible to find a specific agency relationship as to matters subject to manufacturer control." *Stevens v. Ford Motor Co.*, 2020 U.S. Dist. LEXIS 256298, *17 (S.D. Tex. Nov. 2, 2020).

As discussed above, HMA exercises a broad scope of control over its authorized dealerships in this District through their agreements. Among others, HMA requires daily reports regarding sales and deliveries from the dealerships, restricts the locations and ownership transfers of the dealerships, and provides warranty services to consumers through the dealers. Taken together, HMA has a substantial control over its dealerships. Further, the agreements between HMA and its dealerships clearly show that there is manifestation of consent by HMA to the dealerships that the dealerships shall act on HMA's behalf, and the consent by the dealerships to act. Therefore, the Court finds that Hyundai authorized dealerships in this District are agents of HMA at least for venue purposes. In fact, it is not uncommon for a district court to find a principal-agency relationship between an auto manufacturer and its dealers. For example, the District of New Jersey found that "the dealer acted as BMWNA's agent, or at least that the two acted together." *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826, 837-38 (D.N.J. 2013); *see also Kent v. Celozzi-Ettleson Chevrolet, Inc.*, No. 99 C 2868, 1999 WL 1021044, at *4 (N.D. Ill. Nov. 3, 1999) ("While it is certainly true that the mere fact that Celozzi–Ettleson is an authorized General Motors dealer does not make it General Motors' agent, it is equally true that an automobile dealership may under certain circumstances be an agent of the manufacturer."). Particularly, the *Morano* court found that "BMWNA and the dealer function as an integrated, two-part seller" because BMWNA makes all of its consumer sales or leases through its authorized dealers and services the vehicles through BMWNA's Warranty or Maintenance Program, while the dealers

handle the mechanics of the sale or lease and the warranty services. *Morano*, 928 F. Supp. 2d at 837-38.

> ### 2.    *The authorized dealers conduct HMA's business.*

The authorized dealerships are also conducting HMA's business in this District. HMA is in the business of manufacturing and distributing vehicles to consumers. As explained above, the only way that HMA can distribute its vehicles to consumers in this District is through its authorized dealerships in this District. Further, HMA provides new purchase warranties and services to the consumers through its dealerships.

Therefore, the Court finds that the Hyundai dealerships in this District are agents of HMA conducting HMA's business in this District.

## IV.    CONCLUSION

For the reasons above, the Court finds that Defendant has a "regular and established place of business" in the Western District of Texas and venue is proper in this District under Section 1400(b). The Court therefore **DENIES** Defendant's Motion to Dismiss or Transfer.

SIGNED this 17th day of September, 2021.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE